1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

WILLIAMS et al,

               Plaintiff,

     v.

UNITED STATES OF AMERICA,

               Defendant.

Case No. 3:22-cv-05640-TMC

ORDER ON DEFENDANT'S MOTION TO
DISMISS AND PLAINTIFFS' MOTION
FOR SUMMARY JUDGMENT

## I.    INTRODUCTION

Plaintiff Harry Williams sued Defendant the United States of America under the Federal

Tort Claims Act (FTCA), alleging that the negligence of Oregon Army National Guard officers

while planning and conducting a training exercise started a fire that obscured visibility on

Interstate 82, causing Williams to crash his motorcycle and suffer severe injuries. The United

States has moved to dismiss (Dkt. 16), arguing that Williams's claims present nonjusticiable

political questions and that it is immune from suit. Williams has moved for partial summary

judgment (Dkt. 21), arguing there is no genuine dispute of material fact that the United States

was negligent and the sole cause of his injuries.

The Court GRANTS IN PART and DENIES IN PART the United States' motion to

dismiss. Williams has stipulated to the dismissal of his strict liability claims. While Williams's

negligence claims are justiciable, several of his theories are barred by the discretionary function exception to the FTCA. Williams's surviving allegations concern whether the officers' use of explosive devices during the exercise (1) complied with the mandatory fire prevention policy in place at the Umatilla Chemical Depot training range; (2) followed the safety protocol to control fire hazards stated in the officers' risk assessment for the training; and (3) negligently deviated from the plan to keep local firefighters updated on the use of explosive devices.

The Court DENIES Williams's motion for summary judgment. The United States has pointed to sufficient evidence in the record to create a genuine factual dispute as to (1) whether its officers were negligent; and (2) whether Williams is responsible for any comparative fault.

In his reply in support of his motion for summary judgment, Williams also moved to strike (1) the declaration of Lieutenant Colonel Timothy X. Merritt for late disclosure and lack of personal knowledge and (2) the testimony of defense expert Ronald Sanders for lacking foundation. Dkt. 41. Williams's motion to strike Merritt's declaration is moot because the Court's does not rely on Merritt's testimony. And Williams's motion to strike Sanders's testimony is improper because it should have been brought as a *Daubert* motion by the dispositive motion deadline. The Court DENIES both motions to strike.

## II.    BACKGROUND

### A.  The training exercise and motorcycle accident

On May 23, 2016, Harry Williams was riding his motorcycle southbound with a group of friends on Interstate 82. Dkt. 1-1 at 2; Dkt. 24 at 1. Interstate 82 borders the United States Army's Umatilla Chemical Depot where, on that day, the Oregon National Guard was conducting a field training exercise. Dkt. 1-1 at 2; *see* Dkt. 17-10 at 2–4; Dkt. 17-13 at 2.

Around 8:05 a.m., Sergeants First Class (SFC) Ryan Austin and Jeremy Greene were leading the exercise and initiated a simulated sniper attack on the training cohort while they were

on a two lane asphalt road at Umatilla, surrounded by dry grass. Dkt. 19-14 at 2; Dkt. 19-15 at 4. The trainees requested an artillery strike on the sniper and SFCs Austin and Greene threw explosive "artillery simulator" rounds onto the road. *Id*. One of SFC Greene's rounds "bounced a couple times and rolled off the concrete and into the grass" where it exploded and started a brush fire. *See id*.

SFCs Austin and Greene ceased training and commanded the trainees to begin fire suppression, "stomping out the fire" until Oregon Military Department (OMD) firefighters arrived. *See id*. Around 8:18 a.m., SFC Austin called Master Sergeant (MS) Alan Fruitt at Umatilla Range Control to report the fire. *See* Dkt. 19-2 at 26–27. MS Fruitt called OMD fire suppression officer Benjamin Beyers to report that the training cohort had started a fire. Dkt. 19-9 at 22. By the time Officer Beyers and other OMD firefighters arrived, the fire had reached about five acres in size. *Id*. at 24.

By 10:25 a.m., the local fire marshal had been alerted to the fire. Dkt. 17-13 at 3; Dkt. 22 at 1. The fire marshal conferred with the Oregon Department of Transportation (ODOT) and decided to shut down Interstate 82 because the fire was approaching the freeway and could impact visibility on the road. Dkt. 22 at 1–2. At 11:00 a.m., ODOT Coordinator Gene Carbert began closing Interstate 82 by putting up a sign and setting cones at Exit 5. *Id*. at 2. But smoke from the fire had reached the freeway and some collisions had already occurred. *Id*.

Just before the freeway closed, Williams and his friends neared Exit 5. Dkt. 23 at 3; Dkt. 24 at 2. Williams was leading the group when the wind shifted and blew thick smoke onto the freeway. *Id*. Visibility dropped. Dkt. 27-20 at 10–11; *see* Dkt. 27-23 at 4–5. Williams crashed into a Mini Cooper traveling ahead of his group and was sent flying off his motorcycle. *Id*. at 11. Williams lost consciousness and woke up on the road before he was airlifted to Kadlec Regional Medical Center, where he underwent emergency surgery. Dkt. 14-1 at 20.

ORDER ON DEFENDANT'S MOTION TO DISMISS AND PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT - 3

**B.  Army guidelines for training range safety procedures**

The United States Army sets regulations for the development and operation of training ranges such as Umatilla. *See generally* Dkt. 19-4, 19-5. The Army training circular addressing training ranges serves as "a working guide" for range development. Dkt. 30-1 at 11. The training circular explains that range development projects "require careful, deliberate planning by a team who coordinates the Range and Training Land Program (RTLP) process in accordance with Army Regulation (AR) 210-21, Army Ranges and Training Land Program, and this circular." *Id.* at 15. The circular advises installation commanders to "establish range-control and safety programs according to," among others, AR 210-21. Dkt. 19-4 at 7. Commanders should also appoint personnel to supervise weapons firing and enforce safety requirements. *Id.*

AR 210-21 states that installation commanders should establish procedures "for the safe conduct of operations on all firing ranges." Dkt. 19-5 at 15. The relevant chapter of AR 210-21 provides "recommended minimum requirements" for the conduct of "safe, efficient, and realistic training." This includes range regulations and standard operating procedures "developed and tailored for application to the weapon systems fired or anticipated to be fired on the installation, and the management and allocation of training areas." *Id.* at 20. These procedures should address, "at a minimum . . . control and coordination of training facilities, environmental compliance, communications, accident reporting, fire-fighting, ammunition and munition handling . . . range safety requirements and procedures, and severe weather conditions." *Id.* The regulation does not specify requirements beyond these broad categories. *See id.*

**C.  Fire prevention policies at Umatilla Chemical Depot**

The United States Army closed the Umatilla Chemical Depot as an active military base in 2012. Dkt. 17-1 at 5. The Oregon National Guard, however, maintained approximately 2,100 acres and several buildings for training and administrative use. *Id.* Umatilla had its own fire

department when it was an active base and a wildfire response plan last updated in 2010.
Dkt. 17-3 at 2. After Umatilla's closure as an active base, OMD and the Hermiston Fire
Department were contracted to provide firefighting services. Dkt. 17-3 at 2; Dkt. 17-4 at 2–3.
While the OMD and Hermiston Fire contract did not call for a new written wildfire plan, fire
crews maintained the basic elements of the 2010 plan. *See id.*

The 2010 plan noted the Umatilla fire season "runs from the first of June through mid-
September" and in drier years "may last from early May until early October." Dkt. 17-3 at 7. The
2010 plan also stated that a senior fire officer or the Umatilla commander "may" impose
restrictions on range training and that "[s]pecial precautions" shall be exercised for the use of
"[s]moke grenades, flares, and simulators" when there is low fire danger. *Id.* at 15. When there is
moderate to extreme fire danger, the plan prohibits the use of "anything that has the potential of
starting fires" such as explosives and simulators but provides an exception if use is necessary
"[f]or the conduct of essential and specific exercises" approved by the senior fire officer or base
commander and "firefighting equipment and personnel are immediately available." *Id.* at 15–16.

Additionally, the National Guard adopted a fire prevention policy memorandum
circulated on July 1, 2012, that prohibited starting fires and the use of open flames in field
training areas and where "wind can spread sparks or flame." Dkt. 17-5 at 2. The 2012
memorandum also specified that "[b]last simulator munitions may be used as long as they are not
used in dry grass or foliage where they can start fires." *Id.* In its June 2016 investigation into the
brush fire, the Army characterized the 2012 memorandum as the "rules, training, standards,
processes or procedures for using pyrotechnic devices at" Umatilla. Dkt. 17-12 at 6.

**D.  Standard operating procedures for May 23, 2016 training exercise**

Umatilla also retained standard operating procedures applicable "to all units, agencies,
activities and personnel using any training facility" on-site. Dkt. 17-17 at 2. This operating

procedure required the submission and approval of a risk assessment form for any training exercises conducted at Umatilla. *Id*. at 11. The risk assessment form required the analysis and summary of hazards based on "historical lessons learned, experience, judgment, equipment characteristics and warnings, and environmental considerations" in relation to the needs of "the mission or task." *See id*. SFC Austin prepared a risk assessment as course manager for the training exercises that took place on May 23, 2016. Dkt. 17-7 at 2–3.

SFC Austin's risk assessment listed "fire" as a potential hazard to be controlled by ensuring "all pyrotechnics are controlled by cadre[1] and used on paved roads, gravel, or dirt" with "[s]ituational awareness." *Id*. at 3. The potential use of pyrotechnics (such as artillery simulators) during the training was assessed for training value—to train attendees "for combat as realistic[ally] as possible" relative to the fire risk posed by their use. *See* Dkt. 17-6 at 17–18. Any use of pyrotechnics during the training was governed by the 2012 Umatilla fire prevention policy memorandum and SFC Austin's risk assessment. *See* Dkt. 17-12 at 6. Both SFCs Austin and Greene were aware of the fire risk of using explosive simulators at Umatilla given the warm temperatures, strong winds, and grass in the field. *See* Dkt. 17-6 at 49; Dkt. 17-18 at 14–15.

**E.  Training exercise safety briefing and coordination with firefighters**

SFC Austin's risk assessment also stated that the instructors would give a safety briefing "prior to training." Dkt. 17-7 at 3. Instructors would "typically" brief the Umatilla range control officer and OMD fire suppression officer before exercises started each day. *See* Dkt. 19-2 at 11–15. OMD fire suppression officer/wildland firefighter Beyers had seen the May 2016 training exercises in the National Guard scheduling system showing planned use of pyrotechnics and traveled to Umatilla from Salem, Oregon, for firefighting support. *See* Dkt. 19-9 at 14–15. Range

---

[1] SFC Austin clarified at his March 14, 2024 deposition that "cadre" meant the training instructors. Dkt. 17-6 at 21.

control officer MS Fruitt was also present at Umatilla. Dkt. 19-2 at 14–15. SFC Austin testified

MS Fruitt had authorized the use of pyrotechnics on the "gravel road, in dirt, or on pavement."

Dkt. 17-6 at 42. However, neither MS Fruitt nor fire suppression officer Beyers could recall a

safety briefing on the morning of May 23. Dkt. 19-2 at 16–17; Dkt. 19-9 at 19.

Separately, fire suppression officer Beyers had texted SFC Austin on May 22 asking for a

morning briefing, explaining he was "concerned about pyro" and whether it would be used on

May 23 because of the "windy" conditions at Umatilla. Dkt. 19-17 at 2–3. Beyers stated he

would send SFC Austin a message at 8:15 a.m. the following morning and that they could "go

from there." *Id*. at 3. SFC Austin responded that the training cohort would only "use smoke on

the concrete of the final objective" but even that was "not likely." *Id*. The operation schedule for

the exercise prepared by SFC Austin showed that the simulated sniper attack (the "final

objective") would take place on the third day of training, which would have been May 24, 2016,

rather than May 23. *See* Dkt. 17 at 3; Dkt. 17-10 at 2–4; Dkt. 17-13 at 2.

On May 23, Beyers missed a call from SFC Austin around 7:48 a.m. while he was in the

shower. *See* Dkt. 19-9 at 21–22. Beyers assumed the call was to discuss the fire suppression

needs of the training exercise. *Id*. Beyers's call back to SFC Austin at 8:10 a.m. went

unanswered, and at 8:20 a.m., Beyers received a call from MS Fruitt that SFC Austin's training

exercise had "started a fire off Juniper Road." *Id*. at 22.

**F.  Procedural History**

On May 15, 2017, pursuant to 28 U.S.C. § 2675, Williams filed and presented an

administrative claim for damages to the Army for the motorcycle accident and injuries he

suffered on May 23, 2016. Dkt. 1 at 2; Dkt. 1-1 at 2. The Army did not resolve Williams's claim

and he brought suit in this Court under the FTCA on August 30, 2022, alleging theories of strict

liability and negligence in the National Guard's planning and conduct of its May 23, 2016

training exercise and subsequent firefighting response. *See* Dkt. 1 at 4–6.

The case was reassigned to the undersigned judge on August 31, 2023, and on May 9, 2024, the United States moved to dismiss Williams's claims. Dkt. 16 at 2. On May 31, Williams moved for partial summary judgment on liability. Dkt. 30 at 30. As part of his reply in support of summary judgment, Williams also moved to strike the declaration of one of the United States's witnesses, Lieutenant Colonel Merritt, and the report of its expert witness, Ronald Sanders. Dkt. 41 at 1–4. Williams has stipulated to the dismissal of his strict liability claims. *See* Dkt. 18 at 17. The parties have filed all responses and replies. Dkt. 18, 29, 36, 41.

### III.    LEGAL STANDARDS

**A.  Rule 12(b)(1) Motions to Dismiss**

A Rule 12(b)(1) motion seeks dismissal of a claim for lack of subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1). When, as here, the Court responds to factual attacks on subject matter jurisdiction, plaintiffs "must present 'affidavits or any other evidence necessary to satisfy [their] burden of establishing that the court, in fact, possesses subject matter jurisdiction.'" *Edison v. United States*, 822 F.3d 510, 517 (9th Cir. 2016) (alteration in original) (quoting *Colwell v. Dep't of Health & Hum. Servs.*, 558 F.3d 1112, 1121 (9th Cir. 2009)). "Once the moving party has converted the motion to dismiss into a factual motion by presenting affidavits or other evidence properly brought before the court, the party opposing the motion must furnish affidavits or other evidence necessary to satisfy its burden of establishing subject matter jurisdiction." *Savage v. Glendale Union High Sch., Dist. No. 205*, 343 F.3d 1036, 1039 n.2 (9th Cir. 2003).

The Court "may look beyond the pleadings to the parties' evidence without converting the motion to dismiss into one for summary judgment." *Edison*, 822 F.3d at 517 (citing *White v. Lee*, 277 F.3d 1214, 1242 (9th Cir. 2000)). When "evaluating the evidence, the court 'need not presume the truthfulness of the plaintiffs' allegations.'" *Id.* (quoting *White*, 277 F.3d at 1242).

"Any factual disputes, however, must be resolved in favor of Plaintiffs." *Id.* (citing *Dreier v. United States*, 106 F.3d 844, 847 (9th Cir. 1996)).

**B.  Discretionary Function Immunity**

Under the FTCA, the United States waived its sovereign immunity by granting district courts jurisdiction over "civil actions on claims against the United States, for money damages . . . for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission" of a government employee "acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1). The FTCA contains several exceptions to the federal government's waiver of immunity, including the discretionary function exception. 28 U.S.C. § 2680.

The United States is immune from suit under the discretionary function exception for "the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency" or a government employee, "whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). The discretionary function exception applies even if the government agent was negligent in his or her duties, so long as those duties were discretionary. *Kennewick Irrigation Dist. v. United States*, 880 F.2d 1018, 1029 (9th Cir. 1989). The United States bears the burden of proving the applicability of the discretionary function exception. *Whisnant v. United States*, 400 F.3d 1177, 1181 (9th Cir. 2005).

**C.  Two-Step Test for Discretionary Function Immunity**

Courts apply a "'two-step test to determine whether the discretionary function exception' applies." *Schurg v. United States*, 63 F.4th 826, 831 (9th Cir. 2023), *cert. denied sub nom. O'Grady v. United States*, 144 S. Ct. 379 (2023); *see United States v. Gaubert*, 499 U.S. 315, 322–23 (1991); *Berkovitz v. United States*, 486 U.S. 531, 535–37 (1988). "Courts must

determine whether (1) 'the challenged actions involve an "element of judgment or choice"' and, if so, whether (2) the 'judgment is of the kind that the discretionary function exception was designed to shield.'" *Schurg*, 63 F.4th at 831 (quoting *Esquivel v. United States*, 21 F.4th 565, 573–74 (9th Cir. 2021)). If the challenged action satisfies both steps, the discretionary function exception applies, and federal courts lack subject matter jurisdiction over the claims. *Id.*

"Whether a challenged action falls within the discretionary function exception requires a particularized analysis of the specific agency action challenged." *Young v. United States*, 769 F.3d 1047, 1053 (9th Cir. 2014) (citing *GATX/Airlog Co. v. United States,* 286 F.3d 1168, 1174 (9th Cir. 2002)). The Court thus must "identify Plaintiffs' 'specific allegations of agency wrongdoing'" before applying the two-step test. *Id.* (citing *Berkovitz*, 486 U.S. at 540). "To identify the particular agency conduct with which Plaintiffs take issue, [courts] look to the allegations of Plaintiffs' complaint." *Id.* (citing *Whisnant*, 400 F.3d at 1184–85). Here, because the parties have already completed discovery and the United States has made a factual attack on jurisdiction, the Court also looks to evidence Williams has submitted to support and refine his allegations. *Savage*, 343 F.3d at 1039 n.2.

### 1.     Step 1: Element of Judgment or Choice

A challenged action satisfies the first step of the discretionary function test where no "federal statute, regulation, or policy mandated a specific course of action," and the government employee "retained an element of judgment or choice with respect to carrying out the challenged action." *Schurg*, 63 F.4th at 831 (quoting *Green v. United States*, 630 F.3d 1245, 1249 (9th Cir. 2011)). Where a statute, regulation, or policy specifically prescribes the challenged action, the action fails the first step, because "there can be no element of discretion when an employee 'has no rightful option but to adhere to the directive.'" *Esquivel*, 21 F.4th at 573 (quoting *Berkovitz*, 486 U.S. at 536). "An agency must exercise judgment or choice where no statute or agency

policy dictates the precise manner in which the agency is to complete the challenged task."
*Schurg*, 63 F.4th at 833 (quoting *Green*, 630 F.3d at 1250). "If a statute or policy directs
'mandatory and specific action,' however, there can be no element of choice." *Id.* (quoting
*Terbush*, 516 F.3d at 1129).

>     2.     *Step 2: Consideration of Public Policy*

If there is no element of judgment or choice in a challenged action, courts proceed to the
second step and consider "whether the government actor's action or inaction was 'based on
considerations of public policy,' which are 'the kind that the discretionary function exception
was designed to shield.'" *Schurg*, 63 F.4th at 831 (quoting *Green*, 630 F.3d at 1249). "The
pertinent question at the second step of the discretionary function exception test is whether [the
relevant decisions] were based on 'social, economic, and political policy.'" *Id.* at 833 (quoting
*Esquivel*, 21 F.4th at 574). "The challenged decision need not be actually grounded in policy
considerations, but must be, by its nature, susceptible to a policy analysis." *Id.* at 834 (quoting
*Green*, 630 F.3d at 1251). Plaintiffs "bear the burden of showing there are genuine issues of
material fact as to whether the exception should apply, but the government bears the ultimate
burden of establishing that the exception applies." *Id.* at 831–32 (internal quotations omitted).

**D.  Summary Judgment Standard**

"The court shall grant summary judgment if the movant shows that there is no genuine
dispute as to any material fact and the movant is entitled to judgment as a matter of law."
Fed. R. Civ. P. 56(a). A dispute as to a material fact is genuine "if the evidence is such that a
reasonable [factfinder] could return a verdict for the nonmoving party." *Villiarimo v. Aloha
Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002) (quoting *Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242, 248 (1986)). And a fact dispute is "material" "only if it could affect the outcome
of the suit under the governing law." *In re Barboza*, 545 F.3d 702, 707 (9th Cir. 2008). The

moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of a claim for which the nonmoving party has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1985).

The evidence relied upon by the nonmoving party must be able to be "presented in a form that would be admissible in evidence." *See* Fed. R. Civ. P. 56(c)(2). Even circumstantial evidence, however, can defeat a motion for summary judgment if the inferences drawn in the non-moving party's favor are reasonable. *McLaughlin v. Liu*, 849 F.2d 1205, 1208–09 (9th Cir. 1988). "'The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.'" *Tolan v. Cotton*, 572 U.S. 650, 651 (2014) (per curiam) (quoting *Anderson*, 477 U.S. at 255). Whether a witness is credible is "a determination that is exclusively within the province of the factfinder at trial." *Dominguez-Curry v. Nevada Transp. Dept.*, 424 F.3d 1027, 1035–36 (9th Cir. 2005).

## IV.    DISCUSSION

**A.  Williams's strict liability claims are dismissed.**

The United States moves to dismiss Williams's strict liability claims because it has not waived sovereign immunity for strict liability claims under the FTCA. Dkt. 16 at 10–11. Williams has conceded this point, Dkt. 18 at 17, and the Court grants the United States' motion to dismiss Williams's strict liability claims.

**B.  Williams's claims are justiciable and not barred by the political question doctrine.**

The United States argues first that the Court should dismiss Williams's negligence claims as nonjusticiable under the political question doctrine. "The political question doctrine serves to prevent the federal courts from intruding unduly on certain policy choices and value judgments that are constitutionally committed to Congress or the executive branch." *Koohi v. United States*, 976 F.2d 1328, 1331 (9th Cir. 1992). The United States asserts that any judgment regarding the

conduct of the National Guard officers at Umatilla would impermissibly "interject" the Court into military decision making and foreign policy, such as the military's considerations of "the trade-off between safety and greater combat effectiveness" needed for its training exercises. *See* Dkt. 16 at 11–14 (citing *Boyle v. United Tech. Corp.*, 487 U.S. 500, 511 (1988)).

The Supreme Court, however, "has made clear that the federal courts are capable of reviewing military decisions, particularly when those decisions cause injury to civilians." *Koohi*, 976 F.2d at 1331 (citing *The Paquete Habana*, 175 U.S. 677 (1900)). Challenges to military conduct may be justiciable even when the conduct occurs "as part of an authorized military operation"; such claims are "particularly judicially manageable" when a plaintiff seeks only damages for their injuries. *Id*. at 1331–32. Damages actions are "particularly nonintrusive" and unlikely to implicate political questions because they eschew injunctive relief that may require courts to engage in "operational decision-making beyond their competence and constitutionally committed to other branches." *Id*. at 1332 (citing *Fair Assessment in Real Estate Ass'n v. McNary,* 454 U.S. 100, 120–21 (1981)).

In *Koohi*, the Ninth Circuit held that damages claims against the United States Navy—for accidentally shooting down a commercial passenger airplane mistaken for an enemy fighter jet during Persian Gulf operations in the midst of the 1980s Iran-Iraq "tanker war"—could not be "dismissed on the basis of the political question doctrine" because they remained judicially manageable as "a traditional subject of damage actions in the federal courts." *Id*. at 1331. *Koohi* controls the political question argument here. The domestic military training at issue in this case is far removed from the potential for political entanglement presented by reviewing claims arising from the fraught, active international combat zone at issue in *Koohi*. *See id.* (collecting cases allowing damages actions alleging negligence in peacetime military operations and training). And like the *Koohi* plaintiffs, Williams brings only damages claims. The Court's

assessment, for damages purposes, of any negligence by National Guard officers in the Umatilla training exercise will not limit the operational decision-making of the executive branch or implicate any other political questions. This case is not barred by the political question doctrine.

**C. Three of Williams's allegations challenging the United States's conduct are barred by the discretionary function exception and three allegations are not.**

Williams asserts that none of the government conduct at issue is subject to the discretionary function exception, namely: (1) the alleged failure to adopt standard operating procedures and wildfire response plans at Umatilla; (2) SFC Austin's risk assessment for the May 2016 training exercises and choice of fire hazard control methods; (3) SFC Austin's decision to use explosive artillery simulators during the training exercise; (4) SFC Greene's alleged noncompliance with the July 2012 Umatilla fire prevention policy memorandum during the training exercise; (5) the officers' alleged noncompliance with SFC Austin's risk assessment during the exercise; and (6) the officers' failure to inform the fire suppression officer of their plan to use pyrotechnics on May 23, 2016. The Court addresses each allegation in turn.

> 1. *The adoption of standard operating procedures and wildfire response plans at Umatilla is subject to the discretionary function exception.*

Williams alleges that the Umatilla training center "failed, for years, to implement numerous mandatory policies and procedures" related to—among other things—safety, approvals, and fire prevention. *See* Dkt. 18 at 21–22. A challenged action satisfies the first step of the discretionary function test if no "federal statute, regulation, or policy mandated a specific course of action" and the government actor retains "an element of judgment or choice with respect to carrying out the challenged action." *Schurg*, 63 F.4th at 831 (quoting *Green*, 630 F.3d at 1249). "If a statute or policy directs 'mandatory and specific action,' however, there can be no element of choice," and therefore no discretionary function exception. *Id.* (quoting *Terbush*, 516 F.3d at 1129). Williams alleges that the Army's training circular regarding training ranges and

Army Regulation 210-21 prescribe mandatory and specific courses of action for adopting standard operating procedures at Umatilla. Dkt. 18 at 4–5, 21–22. But neither document mandates the training center take a specific course of action.

Instead, the circular states that it serves as "a working guide" for training ranges, disclaiming any mandatory prescription. Dkt. 30-1 at 12. The training circular explains that range development projects "require careful, deliberate planning by a team . . . in accordance with Army Regulation (AR) 210-21 . . . and this circular." *Id.* at 15. The circular only advises installation commanders to "establish range-control and safety programs according to," among others, AR 210-21 (Dkt. 19-4 at 7) and that commanders should appoint personnel to supervise weapons firing and safety requirements. *Id*. The training circular does not detail any specific requirements and leaves the implementation of procedures and safety programs to the commanders' discretion. *See id*. ("Range development projects require careful, deliberate planning by a team . . . ."); *Schurg*, 63 F.4th at 831.

Similarly, while AR 210-21 states that installation commanders should establish procedures "for the safe conduct of operations on all firing ranges," the relevant chapter of AR 210-21 states that it only provides "*recommended* minimum requirements" for the conduct of "safe, efficient, and realistic training." Dkt. 19-5 at 15, 20 (emphasis added). This would include range regulations and standard operating procedures "developed and tailored for application to the weapon systems fired or anticipated to be fired on the installation, and the management and allocation of training areas." *Id*. at 20. These procedures should address, "at a minimum . . . control and coordination of training facilities, environmental compliance, communications, accident reporting, fire-fighting, ammunition and munition handling . . . range safety requirements and procedures, and severe weather conditions." *Id*. The regulation does not specify requirements beyond these broad categories, again leaving room for discretion in its

execution. Dkt. 19-5; *see Sabow v. United States*, 93 F.3d 1445, 1453 (9th Cir. 1996) ("[T]he presence of a few, isolated provisions cast in mandatory language does not transform an otherwise suggestive set of guidelines into binding agency regulations."); *Anderson v. United States*, 606 F.Supp.3d 1040, 1056 (E.D. Wash. 2022) ("[L]anguage must be analyzed in its overall context, and . . . 'mandatory-sounding language such as 'shall' does not overcome the discretionary character of the pamphlet broadly.").

Because the circular gave discretion to the Umatilla command in developing and adopting standard operating procedures and safety programs, the conduct at issue was subject to an element of judgment or choice and fulfills step one of the discretionary function test. *Schurg*, 63 F.4th at 831. At step two, there is no question that the creation of standard operating procedures and safety programs for a military training range is susceptible to the balancing of social, political, and economic policy goals such as a military readiness, safety, environmental protection, and relationships with state and local governments. These interests are reflected in the policies that were in place at Umatilla, including its standard operating procedures (Dkt. 17-17) and fire prevention policy (Dkt. 17-5), among other processes such as contracting the OMD and Hermiston fire departments to maintain aspects of Umatilla's prior 2010 wildfire response plan (Dkt. 17-3). The development of these policies and procedures falls within the heartland of the discretionary function exception for which the United States retains its sovereign immunity. The Court dismisses Williams's claims arising from the alleged failure to adopt sufficient standard operating procedures or safety programs at Umatilla and declines to reach the United States' other arguments against these claims.

        2.     *SFC Austin's risk assessment and choice of fire hazard controls is subject to the discretionary function exception.*

Williams alleges SFC Austin's risk assessment for the May 2016 training exercises and

choice of fire hazard control methods failed to include "additional control methods that could prevent large scale wildfires." Dkt. 18 at 8. Umatilla's standard operating procedures calling for the risk assessment, however, required the analysis and summary of hazards based on "historical lessons learned, experience, judgment, equipment characteristics and warnings, and environmental considerations" in relation to the needs of "the mission or task." *See* Dkt. 17-17 at 2. When SFC Austin prepared the risk assessment as course manager for the training exercise, he recognized that fire was a risk due to the possible use of pyrotechnics. *See* Dkt. 17-7 at 3. He assessed the potential use of pyrotechnics for their training value to expose trainees to "combat as realisti[cally] as possible" relative to the safety risks the explosives posed. *See* Dkt. 17-6 at 17–18. And SFC Austin chose what he considered the appropriate fire hazard control method, to "[e]nsure all pyrotechnics are controlled by [the training officers] and used on paved roads, gravel, or dirt." Dkt. 17-7 at 3. SFC Austin was aware of the fire risk given weather and environmental conditions and weighed them against training needs. *See* Dkt. 17-6 at 49.

Challenged conduct satisfies the first step of the discretionary function test if no "federal statute, regulation, or policy mandated a specific course of action" and the government actor retains "an element of judgment or choice with respect to carrying out the challenged action." *Schurg*, 63 F.4th at 831 (quoting *Green*, 630 F.3d at 1249). SFC Austin's preparation of the risk assessment may have been non-discretionary because he was required to submit the assessment for approval prior to the training exercise—but he had to exercise judgment and choice in preparing the content of the assessment itself. And at step two, SFC Austin's were "based on considerations of public policy." *Schurg*, 63 F.4th at 831 (internal quotation marks omitted). "The challenged decision . . . must be, by its nature, susceptible to a policy analysis." *Id.* at 834 (quoting *Green*, 630 F.3d at 1251). SFC Austin's assessment of the training value of using pyrotechnics in service of military preparedness—versus environmental and public safety—is by

nature a policy analysis. His choices when preparing the risk assessment and choosing fire hazard controls are covered by the discretionary function exception and Williams's claims arising from this conduct are dismissed.

> 3. *SFC Austin's decision whether to use pyrotechnics during the May 23, 2016 training exercise was discretionary.*

During the training exercise, SFC Austin initiated a simulated sniper attack on the training cohort while they were on a two-lane asphalt road. Dkt. 19-14 at 2; Dkt. 19-15 at 4. In response, the trainees requested an artillery strike on the sniper and SFCs Austin and Greene threw artillery simulators onto the road. *Id*. SFC Austin's decision to use explosive simulators in response to the trainee request for artillery remained in his discretion, "to train these soldiers to the best possible way to increase lethality and survivability" in the context of a "fluid" training scenario. *See* Dkt. 17-6 at 41 ("It can't be fake. I got to make it as real as possible. Sometimes I will use no pyros. Sometimes I will use a ton of pyros. Sometimes I plan on using none, but use a ton. Sometimes I plan on using a ton, but use none."); *see also* Dkt. 17-12 at 7 ("[T]he use of pyro is still controlled at the discretion of SFC Austin and governed by the UTC Pyro Memorandum and the RTI risk assessment for this event.").

SFC Austin's decision to use explosive rounds for the training exercise involves discretion like that exercised for his risk assessment. In both instances, he had to weigh the training value of pyrotechnics relative to the environmental and public safety risks. SFC Austin's decision to use pyrotechnics involved judgment driven by public policy considerations and is therefore subject to the discretionary function exception.

> 4. *SFC Greene's alleged noncompliance with the July 1, 2012 Umatilla fire prevention policy memorandum is not discretionary.*

As recognized in the previous section, however, while the overall "use of pyro" was "controlled at the discretion of SFC Austin," it was also "governed by the UTC Pyro

Memorandum and the RTI risk assessment" for the event. Dkt. 17-12 at 17. One of Williams's allegations is that SFC Greene was negligent while throwing his artillery simulator—essentially, that he threw it too hard—and thus failed to comply with the range's mandatory fire prevention policy. This claim is not subject to discretionary function immunity and may proceed to trial.

Umatilla adopted a fire prevention policy memorandum circulated by MS Fruitt on July 1, 2012, that prohibited starting fires and using open flames in field training areas and where "wind can spread sparks or flame." Dkt. 17-5 at 2. The 2012 memorandum also specified that "[b]last simulator munitions may be used as long as they are not used in dry grass or foliage where they can start fires." *Id*. The 2012 memorandum was, in addition to SFC Austin's risk assessment, one of the "rules, training, standards, processes or procedures for using pyrotechnic devices at" Umatilla in effect during the May 23, 2016 training exercise. *See* Dkt. 17-12 at 6.

At oral argument, the United States conceded that the fire prevention memorandum is a mandatory policy under step one of the discretionary function test. Dkt. 51 at 7:1–5. And Williams has presented sufficient evidence to create a genuine factual dispute as to whether SFC Greene complied with that mandatory policy. From the United States' perspective, SFC Greene complied with the policy because he intended to throw the artillery simulator on the concrete but it "accidentally" bounced into the grass. *See id*. at 7:6–20. From Williams's perspective, SFC Greene unreasonably threw the artillery simulator too hard for conditions, causing it to foreseeably end up in the dry grass rather than the concrete. Williams points to an "Abbreviated Ground Accident Report" prepared by the Army shortly after the fire. Dkt. 19-6. One section of the form asks, "Did individual [SFC Greene] make a mistake that caused/contributed to accident or severity of injury/damage?" In response, the supervisor filling out the form checked "yes," coded the mistake as "improper throwing," and explained, "SFC Green's [sic] throw resulted in the simulator landing in the brush starting a fire." Dkt. 19-16 at 3. In another section asking

ORDER ON DEFENDANT'S MOTION TO DISMISS AND PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT - 19

1  "Why was the mistake made?" the supervisor checked the box for "Individual—Mistake due to

2  own personal factors—Overconfident," and explained, "SFC Greene overconfidence in his

3  abilities caused the throw to bounce into the brush causing the fire." *Id.* at 3–4. This is sufficient

4  to create a genuine factual dispute as to whether SFC Greene exercised reasonable care to

5  comply with what the government admits is a mandatory fire prevention policy. These claims are

6  not subject to the discretionary function exception and may proceed to trial.

7        5.      *SFC Austin and Greene's alleged noncompliance with SFC Austin's risk*
                 *assessment for the May 2016 training exercise is not discretionary.*

8

9        Williams also alleges that SFCs Austin and Greene did not comply with SFC Austin's

10 risk assessment for the May 2016 training exercises, and he argues that this noncompliance is not

11 covered by the discretionary function exception. Dkt. 18 at 25. The Court agrees. SFC Austin's

12 risk assessment stated that the training instructors will "[e]nsure all pyrotechnics are controlled

13 by cadre and used on paved roads, gravel, or dirt." Dkt. 17-7 at 3. The risk assessment was one

14 of the "rules, training, standards, processes or procedures for using pyrotechnic devices at"

15 Umatilla in effect during the May 23, 2016 training exercise. *See* Dkt. 17-12 at 6. While SFC

16 Austin's development of the risk assessment involved discretion and policy considerations, the

17 officers' implementation of the assessment's controls during the training exercise did not. *See*

18 *Marlys Bear Med. v. U.S. ex rel. Sec'y of Dep't of Interior*, 241 F.3d 1208, 1215 (9th Cir. 2001)

19 ("The decision to adopt safety precautions may be based in policy considerations, but the

20 implementation of those precautions is not.").

21       The risk assessment required that the training instructors ("cadre") control all

22 pyrotechnics and ensure their use only on paved roads, gravel, or dirt. Dkt. 17-7 at 3. For the

23 same reasons explained in the previous section, there is a genuine factual dispute as to whether

24 SFC Greene reasonably followed that requirement when he threw his artillery simulator. That

1    dispute must be resolved through trial.

2              6.      *SFC Austin's failure to update firefighters on the possible use of*
                       *pyrotechnics is not susceptible to policy analysis.*
3

4            Williams asserts that SFC Austin was negligent when he told OMD fire suppression

5    officer and wildland firefighter Beyers that he would only use pyrotechnics, if at all, on the final

6    day of the exercise—May 24—but then changed plans and used artillery simulators on May 23,

7    without updating Beyers through a morning safety briefing or otherwise. *See* Dkt. 18 at 9–12;

8    Dkt. 17-10 at 2–4; Dkt. 17-13 at 2. Beyers had seen the May 2016 training exercises in the

9    National Guard scheduling system showing planned use of pyrotechnics and traveled to Umatilla

10   from Salem, Oregon, for firefighting support. *See* Dkt. 19-9 at 14–15. MS Fruitt testified that he

11   would let OMD firefighters know what training would be happening at Umatilla in his capacity

12   as range control officer and that firefighters would be present and "voice their opinion" if they

13   saw anything unsafe. Dkt. 19-2 at 9–10.

14           At the direction of MS Fruitt, Beyers texted SFC Austin on May 22 asking for a morning

15   briefing, specifically because Beyers was "concerned about pyro" and whether it would be used

16   on May 23 because of the "windy" conditions at Umatilla. Dkt. 19-17 at 2–3; Dkt. 19-9 at 10–11.

17   Beyers wrote: "If it's going to be used (not if it's windy like this), please let me know." SFC

18   Austin responded: "We might use smoke on the concrete of the final objective but not likely."

19   Dkt. 19-17 at 2–3. Beyers testified that had he known SFC Austin would use pyro the next day,

20   he would have positioned near the training exercise. Dkt. 19-9 at 16. But SFC Austin decided to

21   use the artillery simulators the next morning without (allegedly) conducting a morning safety

22   briefing or otherwise updating Beyers of that possibility, and by the time Beyers reached the

23   training area after the fire started, it was much harder to control. *See id.* at 24.

24           On a motion to dismiss based on discretionary function immunity, the Court "may look

beyond the pleadings to the parties' evidence without converting the motion to dismiss into one for summary judgment." *Edison*, 822 F.3d at 517 (citing *White*, 277 F.3d at 1242). When "evaluating the evidence, the court 'need not presume the truthfulness of the plaintiffs' allegations'" but should resolve any factual disputes in favor of the plaintiffs. *Id.* Additionally, the United States bears the burden of proving the applicability of the discretionary function exception. *Whisnant*, 400 F.3d at 1181.

In this case, the available evidence—that fire suppression officer Beyers accessed the National Guard training scheduling system, checked for upcoming uses of pyrotechnics, and traveled to Umatilla to provide firefighting support, and directly sought clarification from SFC Austin about use of pyrotechnics at the training exercises, along with MS Fruitt's testimony that he would keep OMD firefighters updated regarding training exercises at Umatilla—all indicate that keeping firefighters updated about training exercises was part of the facility's routine safety procedures. The United States argues that testimony is not enough to establish a mandatory policy at step one of the discretionary function analysis. *See* Dkt. 29 at 11–12; *Tam v. United States*, 905 F.Supp.2d 1221, 1233 (W.D. Wash. 2012) ("[The Ranger's] statement is not the sort of mandatory directive that courts analyze under step one of the discretionary function exception . . . courts look to 'established governmental policy, as express or implied by statute, regulation, or agency guidelines.'" (citing *Terbush v. United States*, 516 F.3d 1125, 1130 (9th Cir. 2008))).

But even if there was not a mandatory policy requiring the officers to keep firefighters informed of their planned use of pyrotechnics, and SFC Austin retained an element of choice in deciding whether to hold the typical morning safety briefing or let Beyers know of his changed plans, the United States must still prove step two—that Austin's decision was susceptible to analysis based on social, economic, or political policy considerations. *See Schurg*, 63 F.4th at 831. The United States has not met that burden. There is no evidence in the record that any

social, economic, or political policy consideration weighed against keeping the firefighting crew informed of where or when pyrotechnics might be used, particularly after Beyers asked to be notified. Williams's claims arising from SFC Austin's alleged negligence in his interactions with Beyers may proceed to trial.

**D. Williams's Motion for Summary Judgment**

      *1.*       *Williams is not entitled to summary judgment on liability.*

Williams moves for summary judgment on his claim that the United States was negligent and liable for his motorcycle accident and injuries, such that a trial would only pertain to damages. *See* Dkt. 30 at 30. Summary judgment is inappropriate, however, if there remain "genuine dispute[s] as to any material fact" (Fed. R. Civ. P. 56(a)), "such that a reasonable [factfinder] could return a verdict for the nonmoving party." *Villiarimo*, 281 F.3d at 1061 (quoting *Anderson*, 477 U.S. at 248). In this case, summary judgment is not warranted given the conflicting evidence regarding the alleged negligence by SFCs Austin and Greene and the potential comparative fault of Williams and other motorists. There are, at least, genuine disputes as to: (1) whether a morning safety briefing was conducted and who attended, *see* Dkt. 17-6 at 31–33, Dkt. 17-18 at 6–8; (2) whether SFC Greene was negligent in deploying the artillery simulator, thus violating the July 2012 fire prevention memorandum and the risk assessment prepared for the exercise, *see* Dkt. 17-12; (3) whether SFC Austin was negligent in failing to update Beyers of the possible use of artillery simulators on May 23, *see* Dkt. 17-6 at 31–34, Dkt. 17-18 at 6–8; (4) whether Williams had sufficient visibility to slow his motorcycle and avoid the crash, given that other riders were able to do so, *see* Dkt. 37-1 at 5; and (5) whether another motorcyclist, Mr. Small, could have slowed his motorcycle and avoided hitting Williams, *see id*.

While Williams also asserts that the United States was negligent as a matter of law in its

adoption of standard operating procedures at Umatilla, wildfire management plans, and risk assessments for the training exercise, the Court declines to address these claims because it has already dismissed them based on the discretionary function exception. *See supra* Section IV.C.

> 2.   *Williams's motions to strike are denied.*

Additionally, in his reply in support of his motion for summary judgment, Williams moves to strike (1) the declaration of Lieutenant Colonel Merritt for late disclosure and lack of personal knowledge and (2) the report and testimony of the United States' expert Sanders for lacking foundation. *See* Dkt. 41 at 1–4.

The Court DENIES Williams's motion to strike Merritt's declaration as moot. The Court's decisions on Williams's motion for summary judgment are not based in any part on Merritt's testimony. The bulk of Merritt's declaration goes to Williams's claims regarding Umatilla's standard operating procedures, which the Court has already dismissed because their adoption and development falls under the discretionary function exception. *See supra* Sec. IV.C.

The Court DENIES Williams's motion to strike Sanders's testimony because it is an untimely *Daubert* motion. This District's local rules require *Daubert* motions to be brought separately and filed by the dispositive motions deadline to allow the parties sufficient time and space to brief the requirements of Federal Rule of Evidence 702. *See* LCR 7(d)(4) ("[M]otions to exclude expert testimony for failure to satisfy Fed. R. Evid. 702/Daubert . . . shall be noted for consideration no earlier than 28 days after filing."); LCR 16(b)(4) ("Unless otherwise ordered by the court, parties shall file any motion to exclude expert testimony for failure to satisfy [*Daubert v. Merrell Dow Pharmaceuticals, Inc.*] and its progeny not later than the deadline to file dispositive motions.").

## V.   CONCLUSION

For the reasons explained above, the Court GRANTS IN PART and DENIES IN PART

the United States' motion to dismiss (Dkt. 16); DENIES Williams's motion for summary judgment (Dkt. 21); and DENIES Williams's motions to strike the United States's witnesses (Dkt. 41).

The Court hereby ORDERS:

- The motion to dismiss is GRANTED as to claims regarding the United States' conduct in (1) developing and adopting standard operating procedures and wildfire response plans at Umatilla; (2) the preparation of the risk assessment for the May 2016 training exercise and choice of fire hazard control methods; and (3) the decision to use explosive simulators during the training exercise;

- The motion to dismiss is DENIED as to claims regarding the United States' conduct in (1) implementing the July 2012 Umatilla fire prevention policy memorandum during the May 23, 2016 training exercise; (2) implementing the risk assessment prepared for the May 2016 training exercise; and (3) failing to update firefighters at Umatilla regarding changes in the training schedule and planned use of pyrotechnics.

Dated this 30th day of July, 2024.

Tiffany M. Cartwright
United States District Judge