1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

HARRY H WILLIAMS, III; PAULA
WILLIAMS,

                    Plaintiffs,

        v.

UNITED STATES OF AMERICA,

                    Defendant.

Case No. 3:22-cv-05640-TMC

FINDINGS OF FACT AND
CONCLUSIONS OF LAW

## I.    INTRODUCTION

On August 30, 2022, Plaintiffs Harry H. Williams, III and Paula Williams filed a

complaint against Defendant United States of America, alleging that the negligence of Oregon

National Guard officers conducting a training exercise at the Umatilla Training Center on May

23, 2016, led to a wildfire that obscured vision on the Interstate 82, causing several vehicle

collisions including one that injured Harry.[1] Dkt. 1. The Court heard this matter in a bench trial

that began on September 9, 2024, and concluded on September 18, 2024.

After orders on the parties' motions to dismiss and for summary judgment (Dkt. 46, 52),

---

[1] To avoid confusion, this order will refer to the Plaintiffs by their first names, Harry and Paula.
The Court means no disrespect.

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 1

the remaining issues for trial were: (1) whether the Oregon National Guard officers failed to exercise ordinary care in the execution of the May 23, 2016 training exercise while using pyrotechnic "artillery simulators," (2) whether the harm to Harry was a foreseeable result of the fire, (3) if the officers are immunized from liability under Oregon law, (4) whether Harry was contributorily negligent, and (5) the extent of Harry's injuries and damages caused by the collision. Dkt. 64. The parties submitted proposed findings of fact and conclusions of law. Dkt. 63, 68.

Having heard the testimony, reviewed the admitted exhibits and deposition designations, and reviewed the Parties' briefing, the Court makes the following findings of fact and conclusions of law by a preponderance of the evidence, pursuant to Federal Rule of Civil Procedure 52. The findings and conclusions below are based upon the Court's consideration of all the admissible evidence and the Court's assessment of the credibility of the trial witnesses. Any conclusion of law denominated as a finding of fact shall be deemed a conclusion of law, and any finding of fact denominated as a conclusion of law shall be deemed a finding of fact.

## II.    FINDINGS OF FACT

### A.    Background

1. Plaintiffs are Harry H. Williams III and Paula Williams.

2. Plaintiffs were a married couple at the time of this accident and continue to be so at the current time. Plaintiffs were married in 2004.

3. The Oregon National Guard is an agency of the United States Army.

4. On May 23, 2016, Harry Williams was involved in a collision on Interstate 82 near Umatilla, Oregon while operating his motorcycle.

5. In the accident, Harry was seriously injured, taken to the emergency room at Good Shepherd Community Hospital in Umatilla and thereafter transported by medevac helicopter to Kadlec Medical Center in Richland, Washington.

6.      At the time of the accident on May 23, 2016, Harry was retired from the U.S. Army and employed as a supervisor at the King County juvenile detention center in Seattle, Washington.

7.      At the time of the accident in question plaintiffs resided near Tacoma, Washington.

**B.     The Training Exercise**

8.      On May 23, 2016, Oregon Army National Guard 249/RTI members, under the leadership of Sgt. Ryan Austin, were engaged in a 3-day training exercise at the Umatilla Training Center ("Umatilla"), an Army National Guard installation located in Umatilla, Oregon. The property borders Interstate 82 to the east and Interstate 84 to the south.

9.      The plan for the training exercise, an "Advanced Leader Course" (ALC), included possible use of pyrotechnic "artillery simulators." Throughout the trial, witnesses alternated between referring to these devices as "pyro," "artillery simulators," and "blast simulators."

10.      Sgt. Austin had led the ALC on many occasions and had conducted trainings at Umatilla for four years. He was assisted by fellow RTI instructor Sgt. Jeremy Greene.

11.      Before the training exercise, Sgt. Austin developed a risk assessment to identify and assess hazards that might arise during the training and develop and implement controls to mitigate those hazards. Trial Ex. 2. The risk assessment identified "fire" as a risk; identified "ensure all pyrotechnics are controlled by cadre and used on paved roads, gravel, or dirt" as the control; and stated that the control would be implemented by the instructors through "situational awareness of pyrotechnics."

12.      Information about the training exercise was published in a military notification system, the Range Facility Management Support System (RFMSS), and was available to firefighters from the Oregon Military Department (OMD), who were responsible for providing fire protection for field training exercises at Umatilla in 2016.

13.      Because of the possible use of pyrotechnics, Benjamin Beyers, who at the time was an OMD wildland firefighter, came to Umatilla from Salem for the weekend to be present for the training exercise, along with one colleague. The main purpose of the OMD firefighters

was to be able to put out any fires started by the National Guard soldiers during their training exercise.

14.    Beyers was an experienced wildland firefighter who also served as an instructor in firefighting courses. He worked as a firefighter for OMD from 2011–2023. At the time he testified through deposition, he no longer worked for OMD and was a forest crew coordinator for the Oregon Department of Forestry. Between 2011 and 2016 he had spent significant time at Umatilla.

15.    Umatilla had only two of its own "caretaker" firefighters. The main responsibility of these firefighters was to respond to fires that were not connected to military training exercises (such as fires started by lightning). The caretaker firefighters were not responsible for supporting National Guard training exercises.

16.    Master Sergeant Allan Fruitt of the Oregon Army National Guard was the range operations NCO at Umatilla at the time of the fire. He oversaw all Umatilla operations. Throughout the trial, both parties referred to Master Sgt. Fruitt as the "Range Control Officer," and he confirmed in his deposition testimony that this description was accurate.

17.    As Range Control Officer, Master Sgt. Fruitt was responsible for making sure that training operations were conducted safely and in accordance with standard operating procedures and regulations.

18.    In 2012, Master Sgt. Fruitt authored a memorandum on "Fire Prevention in training areas" at Umatilla. Trial Ex. 1. The memo said: "Blast simulator munitions may be used as long as they are not used in dry grass or foliage where they can start fires."

19.    Master Sgt. Fruitt wrote the memo so that training units would know "what they could and couldn't do" when it came to pyro in exercises. He explained that there are big areas of asphalt or concrete at Umatilla where it is safe to use the munitions.

20.    Master Sgt. Fruitt explained that fire is a threat during training exercises at Umatilla due to the dry weather in the summer and fall and the winds. In spring 2016, the area encompassing Umatilla had experienced higher than average vegetation growth, creating

additional fuel for potential wildfires. *See* Trial Ex. 513.

21.     Master Sgt. Fruitt explained that OMD's wildland firefighters would stage at Umatilla during training exercises to (1) fight fires if they started and (2) speak up and voice their opinion if they saw something that was unsafe.

22.     Master Sgt. Fruitt emphasized that the firefighters' job is to handle fires and that he would typically do what they suggested. He agreed that the OMD firefighters are considered the experts on fire risks in training exercises. He testified that if the OMD firefighters said a particular training exercise using pyro should not proceed, he would follow their recommendation. The Court found this testimony credible.

23.     Master Sgt. Fruitt testified that Ben Beyers, the OMD wildland firefighter in charge of the response to the May 2016 Umatilla training exercise, was a well-trained and experienced wildland firefighter, one of the best he dealt with. Master Sgt. Fruitt agreed that he would respect Beyers's opinion about whether a training exercise should go forward based on fire risk and weather conditions. He also agreed that it would be up to the OMD firefighters whether to stage in the field near the exercise due to fire risk or remain in the cantonment area.

24.     Beyers similarly testified that he had a good working relationship with Master Sgt. Fruitt, and that Fruitt typically deferred to his recommendations on fire safety during training exercises.

25.     When Beyers arrived at Umatilla on the evening of May 22, 2016, he checked in with Master Sgt. Fruitt as the Range Control Officer. Fruitt gave Beyers the cell phone number for Sgt. Austin, for the purpose of contacting Austin to learn the schedule for the training exercise.

26.     Master Sgt. Fruitt specifically told Beyers that Sgt. Austin should be his point of contact for the exercise.

27.     Sgt. Austin admitted he knew that Beyers had reached out to him at Fruitt's behest.

28.     Beyers used the number Master Sgt. Fruitt had provided to exchange a series of text messages with Sgt. Austin. The text messages said:

> **Beyers:** This is Ben Beyers with the OMD wildland fire program. I'm at Umatilla for fire suppression. Where are you at?

**Austin:** I'm out with students in land nav area

**Beyers:** Do you know if soldiers are still in the field and if so, when they'll be done?

**Austin:** We are out of field and will have 67 at 0330

**Austin:** And then another 33 at 0730

**Austin:** We will not be coming out until Tuesday at 1700

**Beyers:** Roger. Is there a good time/place we could face to face? Morning briefing?

**Austin:** We will step off from here at 0700 and drive there if you want to meet before or up there after let me know or let me know what u are thinking

**Beyers:** I can catch you in the field too. I just don't want to interrupt. *I'm only concerned about pyro. If it's going to be used (not if it's windy like this), please let me know.* I'd still like to talk to someone and get an idea of what's going on, but I just said my piece. I'll send you a message at 0815 and we can go from there. Thanks.

**Austin:** No out I this FTX at all

**Austin:** We might use smoke on the concrete of the final objective but not likely

Trial Ex. 3 (emphasis added).

29.     A reasonable person in Sgt. Austin's position would have understood from Beyers's messages that Beyers did not believe it was safe to use pyro in the training exercise if the conditions were windy like they were on the evening of May 22, 2016. Sgt. Austin's testimony that he did not understand Beyers to be telling him not to use pyro was not credible.

30.     As Beyers explained, wind is the main driver of fire, and the grassy environment at Umatilla allows fire to move very quickly in windy conditions. High winds are common in the Columbia Basin area around Umatilla, and Sgt. Austin knew or should have known this. It was foreseeable to Sgt. Austin that if a fire started and could not be immediately contained, it could

quickly grow out of control.

31.     A reasonable person in Sgt. Austin's position would have understood from Beyers's messages that Beyers wanted to speak to him again before any decision to use pyro in the training exercise.

32.     A reasonable person in Sgt. Austin's position would have known from the message exchange that Beyers would rely on Sgt. Austin's statement that it was unlikely he would use pyro at all, and if he did use "smoke" it would not be until "the final objective," which would have been on May 24, not May 23. Sgt. Austin admitted in his written report that "I had told the Fire crew that I wasn't planning on using any pyrotechnics but might use them on the final mission." Trial Ex. 10.

33.     Sgt. Austin admitted he told Beyers he didn't plan to use pyro, but dismissed the significance of this, flippantly testifying that he "rarely does anything according to plan." Sgt. Austin claimed that he "reserved the right" to use pyro at any time during the three-day training. Throughout this testimony, Sgt. Austin was defensive and indignant at having to answer questions about his decisions while leading the exercise. His testimony lacked credibility.

34.     As Beyers testified, if he had known that Sgt. Austin was going to use pyro on the morning of May 23, 2016, he would have positioned his crew near the training exercise to have the best chance of quickly controlling a fire. This is why Beyers reached out to Austin, at Master Sgt. Fruitt's direction, to find out the schedule for the training exercise.

35.     Plaintiffs also presented expert testimony from Colonel Greg Allen, a retired Army officer who spent 11 years in the Active Guard Reserve. He supervised numerous training exercises similar to the Advanced Leadership Course, including many at the Yakima Training Center in Yakima, WA, which has a similar environment to Umatilla. Colonel Allen testified that a reasonable person in Sgt. Austin's position would understand the importance of maintaining coordination and communication with Range Control about the use of pyro. Colonel Allen opined that Sgt. Austin had an obligation to update Range Control on his plan to use pyro, and to make sure that Range Control and the firefighters agreed about whether it was safe. The Court finds

this testimony reliable and credible but would reach the same conclusion as to liability even without Colonel Allen's testimony.

36. Master Sgt. Fruitt, Sgt. Austin, and Sgt. Greene all testified that it was typical practice to have a morning safety briefing on each day of a field exercise.

37. One purpose of the safety briefing was to consider the impact of weather conditions on any planned use of pyro during that day's training.

38. Master Sgt. Fruitt testified that OMD fire would typically attend these safety briefings to help assess weather conditions, and that OMD would be primarily responsible for assessing the circumstances and advising the Army National Guard officers on whether to proceed. Fruitt specifically testified that if a safety briefing had taken place on May 23, 2016, Ben Beyers would typically have been part of it representing the OMD firefighters.

39. Beyers also testified that in his experience at other trainings, a morning safety briefing took place every day, that he would attend the briefing if there were any fire concerns, and that a major purpose of the briefing would be to allow fire to position their resources near the training if needed.

40. No witness had an independent memory of a safety briefing happening on the morning of May 23, 2016. Nor is there any reference to a morning safety briefing in any of the written reports prepared after the fire.

41. Based on the preponderance of the evidence, the Court finds that no morning safety briefing took place.

42. Sgt. Austin testified that there was an initial safety briefing before the training exercise began. Sgt. Greene and Master Sgt. Fruitt corroborated this testimony. But there was no credible evidence at trial that Beyers attended this briefing, or that Sgt. Austin had any discussion with Beyers about the use of pyro before the text message exchange on the evening of May 22, 2016. Sgt. Austin's testimony that he believed Beyers was at this initial meeting was inconsistent with all other evidence and not credible.

43. Master Sgt. Fruitt testified that he did not remember speaking to Sgt. Austin about

the use of pyro on May 23, 2016, before the fire began.

44.     Around 7:30–8:00 a.m. on the morning of May 23, 2016, the soldiers participating in the training exercise were in the field at Umatilla, near the corner of Ironwood Road and H Road. The weather was windy as it had been the night before. Sgt. Greene later wrote in his report that "winds had been gusting consistently." Trial Ex. 11.

45.     Despite his conversation with Beyers the night before, Sgt. Austin decided to use pyro, in the form of "blast simulators," as part of that morning's training exercise. According to Sgt. Greene, Sgt. Austin told him that they could use pyro at their discretion, and Sgt. Greene assumed that was instruction from Range Control, but he did not personally witness a conversation between Sgt. Austin and Range Control.

46.     Sgt. Austin and Sgt. Green each deployed blast simulators near the corner of H Road and Ironwood Road. *See* Trial Ex. 5. Their memories were inconsistent as to which part of the intersection, and in which direction, the blast simulators were deployed. The Court finds that this distinction is immaterial.

47.     The Army training manuals instruct soldiers to deploy the blast simulators by throwing them, whether from a standing, kneeling, or prone position. *See* Trial Ex. 4. Officer Greene testified that he had been trained to deploy the simulators by throwing them.

48.     Sgt. Green and Sgt. Austin intended to deploy their blast simulators on the concrete.

49.     Sgt. Austin dropped his in place, rather than tossing it, although this was inconsistent with his training.

50.     Sgt. Green tossed his underhand, consistent with his training, but it ultimately bounced and rolled into the grass.

51.     The Court finds that Sgt. Green exercised reasonable care when tossing the blast simulator consistent with his training. It is more likely that the blast simulator rolling or bouncing into the grass was an accident that is not attributable to negligence. The Court finds that Sgt. Green and Sgt. Austin acted with reasonable care to comply with the requirements of the fire

prevention memorandum and their risk assessment that pyro only be used on the concrete.

52.     The Court also finds, however, that Sgt. Austin did *not* take any steps—whether by contacting Beyers directly or going through Range Control—to update Range Control and/or Beyers that he had changed his mind and decided to use pyro on the morning of May 23, 2016. This was a failure to exercise reasonable care to prevent a foreseeable danger of wildfire.

53.     Because of Sgt. Austin's failure to exercise reasonable care, when the fire started, the firefighters (Beyers, his OMD coworker, and two caretaker firefighters contracted through BRAC) were not stationed in the field but instead were in the day room in the cantonment area.

54.     Had the firefighters been stationed in the field, it is more likely than not that they could have controlled the fire.

55.     According to Sgt. Greene, the fire "immediately spread" to a length of at least 25 meters due to wind gusts. *See* Trial Ex. 11.

56.     Sgt. Austin contacted Sgt. Fruitt at about 8:18 a.m. on May 23, 2016, using a cell phone. Austin and Fruitt testified that cell phones were used as a backup to radio communications, because the radio batteries sometimes died or the signal was weak due to the topography of the land. Sgt. Austin informed Fruitt there was a fire in the training area, and Fruitt notified Beyers.

57.     At the time of the fire, the vehicle resources available to Beyers and the caretaker firefighters were a "Type 6 brush truck," which Beyers believed was "a 2013 F-550 with a 400-gallon water tank," and the caretaker's truck, which had a 300-gallon tank. Dkt. 71-2 at 6. The fire hydrant infrastructure at Umatilla was old, and many of the hydrants in the field didn't work.

58.     Beyers, his OMD colleague Bill Brady, and the two caretaker firefighters (Mike Bozeman and Terry Christopher) immediately responded with their two wildland firefighting trucks. As soon as they left the gate of the cantonment area, they could see smoke. They reached the scene of the fire in about five minutes.

59.     By the time they arrived, the fire had already spread north and east, up and over one of the old cement bunkers, known as "igloos," that had previously been used to store weapons. Beyers estimated the size of the fire at about five acres.

60.     An "After Action Report" prepared by OMD also concluded that "mapping showed that when OMD fire arrived on the scene, the fire was approximately 5.5 acres in size." Trial Ex. 513.

61.     Master Sgt. Fruitt did not dispute Beyers's statement that the fire had already burned a significant area when he and Beyers arrived at the scene within five minutes after Austin's phone call.

62.     Master Sgt. Fruitt also agreed that he could see smoke billowing from the fire, noting that the cheatgrass common to the landscape causes smoke.

63.     Sgt. Austin gave very different testimony about the size of the fire when Beyers and the other firefighters arrived. Austin described the fire as "down to a few feet," "down to almost nothing," and that it was merely a "smolder." He claimed that the firefighters did nothing when they arrived. Sgt. Greene also testified that the soldiers had put the "majority" of the fire out by the time the firefighters arrived, but his testimony was not so extreme as Austin's.

64.     Sgt. Austin's testimony is irreconcilable with the testimony of Beyers and Master Sgt. Fruitt. The difference in their testimony as to the size of the fire is so vast that it cannot be the result of two reasonable perceptions of the same event. Based on Sgt. Austin's demeanor while testifying—which was frequently defensive, argumentative, and exaggerated—the Court finds that Sgt. Austin's testimony on this point lacks credibility. The testimony of Beyers and Fruitt is also consistent with each other and corroborated by documentary evidence.

65.     The Court finds that the size of the fire at the time the firefighters arrived was closer to five acres, as estimated by Beyers and OMD's "After Action Report."

66.     Despite the firefighters immediately undertaking heroic efforts to fight the fire with the limited resources available to them, and eventually receiving aid from surrounding jurisdictions, the fire grew until it burned over 2400 acres. *See* Trial Exs. 8, 13.

67.     It was foreseeable to someone in Sgt. Austin's position that—given the dry weather, windy conditions, amount of brush to fuel the fire, and limited firefighting resources available—without OMD present to immediately contain the fire, it would grow out of control

and interfere with travel on the adjacent highways.

**C.    The Motorcycle Collision**

68.    On May 23, 2016, Harry Williams and companions James Riggins, James Small, Bryan Neal and Milton Moody were on the first day of a group motorcycle ride to the Midwest. They were headed to Missouri for a national meeting of their motorcycle club.

69.    The group was traveling in a planned formation with Harry leading the group and the others positioned in a staggered pattern behind him. Milton Moody was driving a pickup behind the four motorcyclists.

70.    Harry testified that, as the leader, he paid attention to the posted speed limit and controlled the group's speed.

71.    Harry does not remember the minutes leading up to the accident after the group crossed the Columbia River on I-82.

72.    The group, with Williams as the leader, was traveling southeast in the left lane of two lanes of I-82 that were adjacent to the eastern border of Umatilla. *See* Trial Ex. 7.

73.    As the motorcyclists were approaching the Powerline Road overpass, they could see what appeared to be dust or smoke in the air off to their right.

74.    As the motorcyclists passed beneath the Powerline Road overpass, they could see that the smoke was coming from a fire burning out in the field to their right.

75.    The smoke was at least half a mile from the freeway at that point.

76.    As the smoke blew closer to the freeway Harry signaled his companions to slow down.

77.    The motorcyclists reduced their speed within seconds to 25 to 30 miles per hour.

78.    Visibility was still clear ahead of them.

79.    As the motorcyclists continued to slow, at approximately 11:05 a.m., gusts of wind blew the smoke across I-82 and caused a sudden loss of visibility on the freeway that resulted in multiple vehicles crashing. *See* Trial Ex. 6. The Oregon Department of Transportation had

decided to close the freeway at approximately 11:00 a.m., but the collisions took place before the closure occurred. *See* Trial Ex. 35.

80.    In the heavy smoke Harry's motorcycle crashed into a Mini Cooper that had crossed over from the right lane into his lane.

81.    Upon impact Harry was ejected from his motorcycle and flew over the Mini Cooper, landing on the freeway.

82.    James Small hit Harry's unoccupied motorcycle and was ejected from his motorcycle, also flying over the Mini Cooper.

83.    James Riggins brought his motorcycle to a stop but was immediately rear-ended by a car and ejected forward from his motorcycle.

84.    Bryan Neal, upon hearing Williams's motorcycle crash and seeing him flying over the Mini Cooper immediately moved his motorcycle to the right and proceeded to the shoulder of the road where he stopped and prepared to dismount.

85.    Bryan Neal then heard screeching tires behind him, saw a semi-truck and trailer approaching him and jumped off of his motorcycle before his motorcycle was hit by the trailer of the semi.

86.    A "Traffic Crash Report" from the Oregon Police listed only "obstructed view" under "driver factors" that contributed to the collision. Trial Ex. 517.

87.    The United States' expert, Ron Sanders, testified that Harry had nearly a half mile of open road in which he could see the smoke ahead and slow down. Mr. Sanders opined that Harry should have been able to slow down enough to avoid the accident. The Court finds this testimony unpersuasive.

88.    Mr. Sanders also opined that the catastrophic damage to Harry's motorcycle was "impossible" without a "speed component" to the accident. The Court sustained objections to much of this testimony because it was conclusory, not based on sufficient facts or data, and not the product of reliable principles or methods. But even had the Court admitted this testimony and considered all the opinions in Mr. Sanders's report, the Court would not find his opinion

persuasive in light of the conflicting evidence from the other motorcyclists, the number of near-simultaneous collisions caused by the smoke, and the collision report from the Oregon Police.

89.     Meanwhile, Paula Williams was at work, hosting her colleagues for a statewide training that she was leading. At around 10 or 11 a.m., Paula saw that she had missed several phone calls. When she stepped outside to get better cell service, her phone began pinging with more missed calls and text messages.

90.     Paula then received a phone call from the wife of one of Harry's companions on the motorcycle trip. Paula learned that Harry had been in an accident. Initially, Paula heard only that Harry had a broken leg, and that he had been taken to a local hospital.

91.     Paula drove to Richland, Washington, where Harry had been flown to Kadlec Regional Medical Center. Harry's motorcycle companions met her in the parking lot and told her Harry was in surgery.

92.     Paula was not able to see Harry until that evening, in the intensive care unit. Paula described that her breath was taken away by the sight of Harry in the ICU. His broken pelvis was held in place with external fixators, he was hooked up to machines, and his body looked swollen with fluid.

93.     Other than briefly waking up while face down on the highway, Harry does not remember being taken to the local hospital or the transfer to Kadlec. He first remembers waking up at Kadlec when Paula was there.

94.     Paula slept in the ICU for four nights and stayed in Richland until Harry was discharged from Kadlec to a rehabilitation facility. A coworker drove her laptop to Richland so she could continue working remotely.

### D.     Harry's Medical History

<u>Pre-Existing Conditions</u>

95.     Harry testified that before the 2016 motorcycle accident, in 2003, he was in a car accident that broke his left ankle and tore his anterior cruciate ligament (ACL) and medial

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 14

collateral ligament (MCL). His injuries required surgery and he could not return to work for several months, but he did not experience any long-term problems or impact on his ability to perform his job.

96.     In 2001, Harry was diagnosed with multiple sclerosis (MS).

97.     Harry's first MS symptoms were blurred vision, pressure, and aching in his eyes. He first saw an eye doctor, who referred him to Dr. Mariko Kita, a neurologist specializing in MS.

98.     Harry testified that between 2001 and 2011, his MS treatment with Dr. Kita consisted mainly of MRIs twice a year, self-administered injections once a week, and gabapentin. Harry sometimes experienced flare-ups that made him miss work, and those flare-ups were typically treated with steroid infusions. Other than missing occasional work during flare-ups, Harry's MS did not affect his ability to do his job.

99.     Paula testified that Harry's most common symptoms of MS were blurred vision, tingling and weakness in his limbs, and fatigue. Paula testified that these symptoms mostly occurred during occasional flare-ups, and that the flare-ups occasionally caused Harry to miss work. Paula testified that flare-ups happened two or three times each year. Paula acknowledged on cross that Harry's symptoms could include leg pain and weakness, that it could cause problems standing, he might feel like he needs to lie down, and that it could impact his daily activities. Paula also acknowledged that MS affected Harry's balance and that he occasionally experienced urinary incontinence. This testimony was consistent with Harry's medical records.

100.    Harry applied for VA disability benefits related to his MS because he believed it was connected to his service in Desert Storm. The VA awarded Harry a 30% service-connected disability rating for his MS. In 2023, this was increased to 70%. No documents related to Harry's VA benefits were introduced into evidence, but Harry testified that the 2023 increase was due to the VA reconsidering its initial decision and not due to a worsening of his MS symptoms.

Injuries from the 2016 Motorcycle Collision

101.    Immediately after the accident on May 23, 2016, Harry was taken by emergency

medical services to Good Shepherd Medical Center in Hermiston, Oregon, where a CT scan showed he had multiple pelvic fractures (including a fracture through the right SI joint with "marked displacement,") multiple rib fractures, and fractures of the left tibia and fibula. Harry's fractured tibia bone was sticking out of his left leg and he had significant swelling of his groin and right hip. He was flown to the nearest trauma center at Kadlec Regional Medical Center in Richland, Washington.

102.    At Kadlec, Harry underwent multiple surgeries to repair the fractures to his left leg and pelvis. The surgeons first used external fixators for stability before using permanent internal rods and screws to repair the bones. An X-ray of Harry's pelvis post-surgery described the following: "Post multiple fractures in a complex pattern with intervention. Fusion of both SI joints by traversing screws. Fixation of the right pelvic sidewall and symphysis pubis by a stable intact plate and multiple screws."

103.    A fracture to Harry's right ankle was also discovered and repaired through surgery with screws as internal fixators. Harry's left thumb was also dislocated and required surgical ligament repair.

104.    On June 3, 2016, Harry was transported by ambulance to Life Care Center of South Hill in Pierce County, Washington for rehabilitation. The ambulance ride was painful for Harry.

105.    Harry stayed at Life Care until July 14, 2016.

106.    Paula spent as much time as possible at Life Care helping to take care of Harry, working remotely when she could.

107.    Paula testified that Harry could not bear any of his own weight for approximately six weeks.

108.    While at Life Care, Harry and Paula had to learn how to transfer him in and out of his wheelchair to the bed, car, and toilet.

109.    Harry still required the use of a wheelchair when he was discharged from Life Care to his home. His records from Life Care reflect that he was still "nonweightbearing to bilateral lower extremities" at discharge. Because their home is two stories, and all the bedrooms

are upstairs, Harry and Paula rented a hospital bed, where he slept in their front room.

110.   Harry still had an open wound related to his left tibia fracture, which required ongoing wound care and took nearly three months to heal.

111.   When Harry first returned home, he had to use a portable toilet next to his hospital bed. As he grew stronger, he was able to access their first-floor bathroom using his wheelchair once the door to the bathroom had been removed. But because the first-floor bathroom did not have a shower, for about a month after Harry returned home, Paula helped him take sponge baths in the hospital bed. For several months after that, Harry could bathe only by going to a friend's home twice a week, where he could access a ground-floor bathroom with a shower and shower chair.

112.   During this time, Paula was Harry's primary caregiver, in addition to continuing to work her own full-time job. She provided all his personal care assistance, did all the housework, and took him to all his medical appointments.

113.   In addition to his physical pain, this caused Harry significant emotional harm. He testified that he was raised that part of his role as a man was to take care of the house, and that it was difficult to accept that Paula had to take care of him, like "taking care of an adult child."

114.   Harry could also see how much stress his injuries put on Paula. He noticed that she would try to hide from him when she had been crying.

115.   Ashley Cobb, a close friend of Harry and Paula's, also testified about the toll the accident took on Harry and Paula. She described how Paula spent a good portion of her time as a caregiver for Harry, and that Harry's injuries and need for assistance came before Paula's own personal and professional needs.

116.   Harry transitioned from using a wheelchair, to using a walker, to using a cane by November 2016.

117.   Through physical and occupational therapy, Harry made steady progress in regaining functional capacity, and by March 2017 he was focused on improving his speed, strength, and agility so that he could return to full duty as a juvenile correction officer.

118.   Harry's medical records from Rainier Orthopedics during this time show that his "severe pelvic ring injuries" resulted in "residual malalignment of the right sacroiliac joint."

119.   His medical records also show persistent complaints of sciatica on Harry's right side that began after the 2016 accident.

120.   The parties agree that Harry incurred $492,031.01 in medical expenses caused by the 2016 accident through August 2017. Trial Ex. 30.

2019 Motorcycle Accident

121.   In August of 2019, Harry was in a second motorcycle accident. He suffered a traumatic brain injury and a broken scapula. He spent about two weeks at Tacoma General Hospital, followed by about three to four weeks in a Good Samaritan rehabilitation facility.

122.   Although initially Harry and Paula thought his brain injury might be permanently disabling, Harry recovered well, and was able to return to work again about six months after that accident.

Disputed Past Medical Treatment and Expenses

123.   The parties dispute past medical expenses from September 2017 until the time of trial.

124.   Plaintiffs claim that Harry incurred the following reasonable and necessary medical expenses between September 2017 and September 2022 because of the 2016 accident:

   a.   Olympic Sports & Spine: $27,827.00

   b.   All About You: $155.00

   c.   Virginia Mason: $9,616.61

   d.   Sound Family Medicine: $602.00

   e.   Pacific Podiatry: $1,839.38

   f.   Franciscan Pain Management: $476.00

125.   Plaintiffs presented expert testimony from Dr. Jonathan Ritson to support the reasonableness and necessity of medical expenses between September 2017 and September 2022. Dr. Ritson is a board-certified physical medicine and rehabilitation specialist who was retained

by Plaintiffs to conduct independent medical examinations of Harry in 2018 and 2022.

126.    Dr. Ritson testified that the sacroiliac (SI) joint, which connects the spine to the pelvis, is extremely important for the stability of the back and spine, and that Harry's ongoing pelvic and back pain, right buttock pain, and right leg pain are more likely than not caused by the trauma and surgical repairs to his spine, pelvis, and SI joint.

127.    Dr. Ritson testified that Harry's L5/S1 radiculopathy (nerve pain down his right leg) was caused by the 2016 accident and related to the injuries to his pelvis. Harry's medical records and testimony of lay witnesses confirmed that although Harry experienced other types of lower extremity weakness and pain in the past related to his MS, the right-leg radiculopathy began after the 2016 accident, when Harry started to bear his own weight.

128.    Dr. Ritson also testified that his physical exam of Harry showed some weakness in the lower extremities, an abnormal gait, and an unlevel pelvis (pelvic obliquity) leading to a leg-length discrepancy.

129.    Harry has continued to receive physical therapy since the 2016 accident. Harry testified that his physical therapy sessions work on walking, leg strength, and pain, and that they help him be able to perform his job.

130.    Dr. Ritson did not believe that Harry had reached maximum medical improvement.

131.    Dr. Ritson opined that the 2019 accident did not seem to have an impact on Harry's 2016 injuries.

132.    Dr. Ritson acknowledged that his records review did not include Harry's medical records before the 2016 accident.

133.    Dr. Ritson also acknowledged that between his 2018 and 2022 reports, Harry did not follow any of the recommendations made in his 2018 report. Dr. Ritson also withdrew his original opinion that Harry experienced neck pain as a result of the 2016 accident.

134.    The defense presented the testimony of Dr. Edward Dagher, a specialist in occupational and musculoskeletal medicine. Dr. Dagher opined that Harry reached Maximum Medical Improvement in July/August 2017, and that his complaints since that time represent pre-

existing symptoms and conditions that were not permanently aggravated by the May 2016 motorcycle accident. Dr. Dagher emphasized that even before the 2016 accident, Harry had experienced lower extremity pain and weakness, balance problems, and fatigue due to his multiple sclerosis. Harry also experienced increased fatigue and balance problems following his 2019 motorcycle accident and TBI. These opinions were consistent with Harry's medical records.

135.    The Court finds that Dr. Ritson's testimony was persuasive with respect to Harry's ongoing pain in his back, pelvis, right buttock, and right leg (including the sciatica or radiculopathy Harry experiences in his right leg), as well as the pelvic obliquity and leg-length discrepancy.

136.    The Court finds that Dr. Dagher's testimony was persuasive with respect to Harry's ongoing symptoms of fatigue and problems with balance.

137.    The Court finds that, except for the bill from All About You, the medical expenses Harry seeks between September 2017 and September 2022 were reasonable and necessary, based on the testimony of Dr. Ritson, Harry, Paula, and lay witnesses who testified as to their observations of Harry's symptoms and pain. The Court therefore awards Harry $40,360.99 in additional past medical expenses, for the following bills:

        a.   Olympic Sports & Spine: $27,827.00

        b.   Virginia Mason: $9,616.61

        c.   Sound Family Medicine: $602.00

        d.   Pacific Podiatry: $1,839.38

        e.   Franciscan Pain Management: $476.00

138.    Plaintiffs also seek a total of $282,718.20 in medical expenses that were incurred between September 2022 and the date of trial. *See* Trial Ex. 15.

139.    The Court previously found in its order on motions in limine that Plaintiffs did not timely disclose Dr. Ritson's opinions on the reasonableness and necessity of medical treatment post-dating his 2022 IME report. Dkt. 70 at 11 ("The Court will allow Dr. Ritson to testify as to the reasonableness and necessity of medical bills that he reviewed before his 2022 IME report.

His testimony as to bills after that point must be excluded under Rule 37(c) as a sanction for the late disclosure."). The Court reiterated this ruling during trial as well.

140.    Consistent with this prior ruling, the Court finds that Plaintiffs did not present sufficient evidence to establish the reasonableness and necessity of past medical expenses from September 2022 until the time of trial. The admissible opinions from Dr. Ritson did not encompass this period and no other testimony established the reasonableness of the charges, even if there was sufficient evidence that some additional treatment was necessary.

Disputed Future Medical and Life Care Needs

141.    Harry testified that after the 2019 accident, he has continued to experience ongoing symptoms from his 2016 accident. Harry's testimony focused primarily on his back and pelvis, right buttock, and right leg pain, including sciatica or nerve pain down the right leg; the impact of that pain on his gait; and the impact of that pain on his ability to sit for long periods of time, all of which affects his mobility, his ability to perform his job, and his quality of life outside of work.

142.    The Court finds that Harry's ongoing back, pelvic, right buttock, and right leg pain, as well as his gait abnormality, pelvic obliquity, and leg length discrepancy, are more likely than not caused by the 2016 accident, and that Harry will continue to experience these symptoms to some degree throughout his life.

143.    The Court finds that Harry's fatigue and balance concerns are more likely than not related to his preexisting MS or the traumatic brain injury sustained in the 2019 motorcycle accident.

144.    Harry testified that he was referred to a Virginia Mason pain clinic for his leg pain. He ultimately received a spinal cord stimulator after a trial period. Harry testified that it helps lower his overall level of pain, that he prefers it to taking pain medication, and he plans to keep it for as long as it is helpful.

145.    The Court finds that Harry has not presented sufficient evidence that implantation of the spinal cord stimulator was reasonable or necessary and declines to award future medical

expenses related to that treatment.

146.    Apart from treatment related to the spinal cord stimulator, Harry presented testimony from Cloie Johnson, a Vocational Rehabilitation Counselor and Life Care Planner, who made recommendations for future treatment based on the medical opinion testimony of Dr. Ritson and her vocational rehabilitation experience. Of those recommendations, the Court finds the following to be reasonable and necessary based on the testimony of Dr. Ritson and the care Harry has or has not sought out since Dr. Ritson's 2018 IME:

      a.   Trigger Point Injections (Right Buttock)

      b.   Steroid Injection – Right Trochanteric Bursa

      c.   Steroid Injections – Ischial Bursa

      d.   X-Ray below iliac crest

147.    Based on the testimony of Plaintiff's economist William Brandt as to the net present value of those recommended items (Trial Exhibit 22B, Schedule 20), the Court awards $24,658.00 for future medical expenses as follows:

      a.   Trigger Point Injections (Right Buttock): $10,507.00

      b.   Steroid Injection – Right Trochanteric Bursa: $11,827.00

      c.   Steroid Injections – Ischial Bursa: $1,962.00

      d.   X-Ray below iliac crest: $362.00

**E.    Williams' Employment History**

148.    Harry joined the military after graduating from high school. He served as a military policeman, served in Operations Desert Shield and Desert Storm for almost a year, and spent time stationed in Iraq, Germany, South Korea, and Panama, as well as Fort Lewis (now Joint Base Lewis McChord) in Tacoma, Washington. Harry was honorably discharged in October 1995.

149.    After leaving the military, Harry wanted to work in law enforcement and to work with at-risk youth.

150.    In 1997, Harry joined the King County Department of Adult and Juvenile Detention as a juvenile detention officer. He worked his way up to a position as a juvenile

detention supervisor, which is the position he held at the time of his motorcycle accident in May 2016.

151.    The parties agree that because of the 2016 accident, Harry experienced past wage loss of $48,693.50.

152.    Paula testified that Harry's pre-existing MS did not affect his ability to work or commute to work.

153.    A former supervisor of Harry's, Lisa Hymes-Davis, testified that Harry is "a soldier's soldier," the type of person who takes care of any task that needs doing without complaint, who is always on time and always responsible.

154.    Ms. Hymes-Davis testified that Harry was well-respected by both his colleagues and the juvenile detainees he worked with.

155.    Ms. Hymes-Davis testified that before Harry's 2016 accident, she did not even know he had MS, and that she was not aware of any difficulties that Harry had performing his job.

156.    Harry returned to a light-duty position at work in approximately February 2017, about nine months after the accident. His light-duty position was in an office in downtown Seattle, and he was able to take the Sounder train to work to avoid driving, which caused additional pain. He still experienced pain in his pelvis, hips, right buttock, and right leg.

157.    Ms. Hymes-Davis testified that Harry's position with King County allowed for only six months of light duty work; if he could not return to his regular job after six months, he would have to go back on leave.

158.    Paula testified that even if Harry was still recovering, he was anxious to return to work to make sure he did not lose his career with King County. He was also excited to get back to a more normal routine. Harry enjoyed his job and it felt good for him to be contributing to his household again.

159.    Harry was able to perform light duty work for about six months before returning to his previous position in approximately August 2017.

160.     Once Harry returned to his regular position, his schedule did not allow him to take the Sounder train, and he drove to work. On the day shift, his commute from Frederickson, Washington to central Seattle could be as much as two hours each way. Driving caused him pain in his pelvis, hip, and right leg.

161.     Ms. Hymes-Davis testified that when Harry began his regular position again after his 2016 accident, she could see him limp, and could see that running was painful for him. She also knew that he received accommodations at work in the form of a standing desk, a standing chair, and permission to stand in meetings while others were seated.

162.     Ms. Hymes-Davis could tell that Harry's leg and back were what bothered him, and his pain appeared continuous to her.

163.     Ms. Hymes-Davis explained that supervisors like Harry are not the primary responders to situations requiring the use of force, and rather are supposed to direct the situation, but they still must respond if other officers are not available.

164.     When Harry resumed his role as a juvenile detention supervisor, he was required to complete physical restraint testing. When he first took the test, he did not meet the standards, as the pain and weakness in his leg limited his ability to get down on the floor. He later re-tested and was able to pass.

165.     Harry has been able to perform as needed in use of force situations at work, but it aggravates his pain.

166.     Supervisors oversee the entire shift, making sure the officers for each unit are performing their duties and managing any emergency responses (known as "codes"). As a supervisor, Harry is also responsible for making sure the officers he supervises are carrying out the day-to-day programming for youth detainees and ensuring that the detainees are transported to necessary outside appointments.

167.     There are two supervisors for each shift.

168.     Supervisors must be capable of the same type of use of force response even if they are not the primary responders.

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 24

169.     Eventually, Harry was able to switch to the night shift, which cuts down on his commute time and the number of use of force incidents to which he must respond.

170.     The night shift goes from 11 p.m. – 7 a.m.. The supervisors for the night shift start at 9:30 p.m. (a 10-hour shift). Because the detainees are in individual cells sleeping for most of this time, there are rarely emergencies unless a detainee attempts self-harm or is combative during a night-shift intake.

171.     There are three to four code responses each week across all shifts.

172.     On the night shift there are maybe two codes responses per month.

173.     Ms. Hymes-Davis did not observe Harry experiencing fatigue, problems with balance or standing, or brain fog. Instead, what she observed was his limp, and that it was painful for him to run and to sit after the 2016 accident.

174.     Harry's goal is to retire from King County as a supervisor. Before the 2016 accident, his plan was to retire from King County at age 62 and then pursue nonprofit work.

175.     After his second motorcycle accident, Harry was away from work for approximately six to seven months. He returned to his regular job at King County in the spring of 2020.

176.     His supervisors have not expressed any concern that he is unable to perform his job.

177.     Harry's intent now is to stay at his current job until he is first eligible to retire with a pension, upon his thirtieth anniversary of employment, at the beginning of 2027. At that time, Harry will be 56 years old.

178.     Plaintiffs presented the testimony of Cloie Johnson, a Vocational Rehabilitation Counselor and Life Care Planner. *See* Trial Exs. 20a, 20b, 21. Ms. Johnson relied on the medical opinions of Dr. Ritson and a functional capacity evaluation performed by Christina Casady. *See* Trial Exs. 18, 19. Ms. Johnson opined that the physical demands of Harry's current job exceed his capacity, and that instead of continuing in his current position, he should resign and seek vocational rehabilitation by completing a Bachelor's degree. This testimony was unpersuasive.

179.     The Court finds, by a preponderance of the evidence, that Harry can perform his current job, but that due to ongoing pain and impaired mobility from the 2016 accident, he will retire from his job earlier than intended, at the beginning of 2027, instead of at age 62.

180.     In response to questions from the Court, Plaintiffs' economist William Brandt and Defendants' economist William Partin each submitted additional calculations of Harry's economic loss assuming he retires at the beginning of 2027. Trial Exs. 22C, 520. Mr. Partin also offered live testimony to accompany his calculations.

181.     Mr. Partin and Mr. Brandt disagreed on several assumptions used to calculate Harry's lost wages, including the appropriate discount rate; how to estimate the value of Harry's pension benefits; and Harry's worklife expectancy. *See* Trial Exs. 22C, 511, 520.

182.     Although both economists presented reasonable models for calculating Harry's economic loss, the Court finds that Mr. Brandt's presentation was more persuasive and supported by a more detailed explanation of his calculations and assumptions. The Court therefore adopts Mr. Brandt's calculations at Schedule 2A of Trial Ex. 22C, assuming that Harry retires from his employment with King County on January 2, 2027. Based on those calculations, Harry's net loss of future wages is $532,955.

## F.     Williams' Quality of Life

183.     Before the collision, Harry was an active individual. He enjoyed exercising (such as running, bicycling, and weightlifting), playing basketball, taking care of his yard, and detailing his car. He was also a semi-professional bowler and frequently participated in bowling leagues and tournaments.

184.     Before the collision, Harry and Paula had an active social life. They had no children, and spent time traveling, bowling, going out with friends to listen to jazz and drink wine, and participating in Harry's motorcycle club.

185.     Harry's motorcycle club, Full Tilt Riders, was an important part of Harry and Paula's lives. Harry was an active member and officer in the organization, and in addition to local and long-distance motorcycle rides, Harry and Paula often participated in club social events and

community service activities.

186.    Sam Cobb, a friend of Harry's through the motorcycle club, testified that Harry had an outgoing and enthusiastic personality, and that he was an athletic man who enjoyed playing basketball and bowling. Mr. Cobb testified that he cannot recall Harry having any noticeable physical limitations. Mr. Cobb knew Harry had MS because the motorcycle club participated in MS charity events, but he could not observe Harry's symptoms.

187.    Mr. Cobb described Harry and Paula as a fun couple, with whom he and his wife would socialize, often going out to restaurants and bars.

188.    Paula testified that Harry's MS rarely impacted their social activities.

189.    For several months after the 2016 accident, Harry and Paula's social life was non-existent. They were overwhelmed with the daily burden of Harry's recovery.

190.    After Harry returned to work, he would be exhausted when he got home every day. Before his accident, after work Harry and Paul would often shop, cook, do yard work, or exercise. After his accident, he was so exhausted when he got home that he couldn't do much of anything.

191.    Around the end of 2018, Harry began riding his motorcycle again.

192.    He did not ride as much as he previously had but was able to work his way up to cross-country trips.

193.    He had a special seat designed that was more comfortable for his hips and leg. He took more time to do longer trips, breaking the trips up into smaller pieces each day.

194.    With those modifications, he was able to go on club rides, including local rides such as from Tacoma to Portland or Spokane, and to nationals at least once.

195.    Harry was also able to resume some exercise, including going to physical therapy, riding his bicycle, using his elliptical machine, and light weights.

196.    In 2017 and 2018, Paula and Harry were able to travel again. They took trips to Portland, St. Louis, Eastern Washington, Las Vegas, Iowa, the Washington Coast, Texas, and Reno. These trips included car, motorcycle, and air travel.

197.    Between the 2016 and 2019 accidents, Harry was also able to remain involved

with his motorcycle club. In Paula's testimony, she identified photos showing Harry attending many club barbeques, community service events, and holiday parties. Although in some of these photographs Harry was using a cane, and the Court credits Paula and Harry's testimony that his participation was at times limited by his injuries, the motorcycle club remained an active part of their social life.

198.    Mr. Cobb testified that Harry did not fully participate in those club events, and not in the way that he used to before the accident.

199.    After the 2019 accident, however, Harry stopped riding his motorcycle, and both his participation with the club and his travel with Paula declined significantly.

200.    Paula testified that to this day, Harry feels bad that he's not able to do things around the house or in the yard the same way.

201.    Paula testified that she can tell when Harry is in pain by the way he winces, tries to adjust to find a comfortable position when lying or sitting down.

202.    Mr. Cobb testified that he can still see that Harry experiences pain in his leg while walking.

203.    Harry's pain down his leg continues to impact his daily activities.

204.    Harry uses a seat cushion to help alleviate his pain when driving, riding in the car, or sitting for long periods of time.

205.    Paula testified that Harry no longer goes bowling, his exercise is mostly limited to going to physical therapy, and he can no longer do yard work.

206.    Paula testified that Harry's chronic pain limits their social activities and travel together, and that they no longer have physical intimacy.

207.    Harry's chronic pain in his back, pelvis, right buttock, and right leg is more likely than not attributable to the 2016 accident.

208.    The ongoing damage to Harry and Paula's social life is attributable to both the 2016 and the 2019 accidents, but primarily the 2019 accident.

### III.   CONCLUSIONS OF LAW

**A.   Negligence Under the Federal Tort Claims Act (FTCA)**

209.   Williams asserts a claim of negligence against the United States under the FTCA.

210.   This Court has jurisdiction pursuant to 28 U.S.C. § 1346(b).

211.   Venue is proper in the Western District of Washington pursuant to 28 U.S.C. § 1402(b) because Williams resides in this judicial district.

212.   Under the FTCA, the United States is liable for "personal injury . . . caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1).

213.   Oregon law governs the substance of this matter because the events occurred in and around Umatilla, Oregon. 28 U.S.C. § 1346(b)(1); *Avina v. United States*, 681 F.3d 1127, 1130 (9th Cir. 2012) (citing *Richards v. United States*, 369 U.S. 1, 7 (1962)) (applying California law in FTCA case because events at issue occurred in California).

214.   The elements of negligence under Oregon law are: "(1) defendant's conduct (2) unreasonably (3) created a foreseeable risk (4) to a protected interest (5) of the kind that befell the plaintiff, and (6) that defendant's conduct in fact caused the harm that plaintiff incurred." *Scott v. Kesselring*, 370 Ore. 1, 17, 513 P.3d 581 (2022).

215.   Where there are multiple causes and/or tortfeasors for an injury, Oregon "has abolished not only the terms but also the concepts of 'proximate' and 'legal' cause." *Lasley v. Combined Transp., Inc.*, 351 Or. 1, 6, 261 P.3d 1215, 1219 (2011). Instead, when "a defendant's negligence is a factual cause of harm to the plaintiff, the defendant is subject to liability to the plaintiff as long as the harm the plaintiff suffered was a reasonably foreseeable result of the defendant's negligence." *Id*. A defendant's conduct will be determined to be a cause of injury so long as the act or omission was a substantial factor in causing injury to the plaintiff. *See id*. at 27.

216.   The United States had a duty of ordinary care as the owner of the military training grounds at Camp Umatilla. "The duty of a landowner to those who travel adjacent to it is a limited

duty of ordinary care, rather than a duty to avoid only willful or wanton conduct, as would be owed to an ordinary trespasser. That duty is premised on the value that society places on the interest in public passage, and it strikes a balance between that interest and a landowner's equally important interest in the exclusive use and enjoyment of his or her own property." *Towe v. Sacagawea, Inc.*, 357 Or. 74, 101, 347 P.3d 766 (2015).

217.    The United States, through the acts and omissions of Sgt. Austin when he failed to communicate with Beyers and Range Control about his plan to use pyro on the morning of May 23, 2016, acted unreasonably to create a foreseeable risk of fire that would grow out of control and interfere with visibility for travelers on the adjacent highways, including Harry Williams. It was foreseeable that, given the gusting wind conditions, visibility could be obscured quickly by the fire's smoke, leading to vehicle collisions.

**B.    National Guard Immunity Under Oregon Law**

218.    The United States has asserted that Oregon statute O.R.S. § 399.225 immunizes the Oregon National Guard officers and, by extension, the United States, from liability in this case. The United States argues that because Sgt. Austin would have immunity under Oregon law as an Oregon National Guard officer, there is no "private party" analogue and therefore no jurisdiction under the FTCA. *See* Dkt. 28; Dkt. 64 at 2. This argument is unpersuasive.

219.    O.R.S. § 399.225 specifies that members of the Oregon National Guard "ordered into active service of the state" are immunized from liability for any civil or criminal acts done while performing that service. *Id*. at 399.225(1). Active service is specifically differentiated from "inactive duty training or annual field training" by the Oregon Office of the Attorney General. 41 Or. Op. Att'y Gen. 441 at *1 (1981). "Separate and apart from their functions directly on behalf of the State of Oregon, all members of the National Guard are required to perform duties which are basically federal in nature. The weekend inactive duty training and annual field training are examples of such federal functions. These training activities are federally required of members in order to maintain their federal recognition." *Id*. "Claims which arise out of activities during weekend inactive duty training, annual field trip training, or other federal duty activities may not

be brought against the state, but they may be presented to the federal government." *Id*. at *3. This is consistent with amendments to the FTCA made in 1981 to specify that "members of the National Guard" are employees of the federal government while "engaged in training." 28 U.S.C. § 2671. Because the officers here were engaged in federal training, not active service of the state, the Oregon immunity statute does not apply.

220.    This conclusion is also consistent with the basic principle that the FTCA "requires a court to look to the state-law liability of private entities, not to that of public entities, when assessing the Government's liability." *United States v. Olson*, 546 U.S. 43, 46 (2005). It would be inconsistent with this principle to look to the liability of Oregon National Guard members *when acting on behalf of the state*, rather than looking to their liability if they were private individuals. The correct analogue is that of a private landowner, and the immunity statute for members of the Oregon National Guard ordered into service of the state does not act to deprive this Court of jurisdiction.

## C.    Contributory Negligence

221.    Under Oregon law, any damages allowed shall be diminished in the proportion to the percentage of fault attributable to the claimant. O.R.S. § 31.600. The comparative-fault defense in O.R.S. § 31.600 is permitted not only in common-law negligence actions, but also applies to actions based on tortious conduct, however described, in which contributory negligence is an appropriate defense. *Thomas v. Dillon Fam. Ltd. P'ship II*, 319 Or. App. 429, 439, 511 P.3d 43 (2022).

222.    No fault should be attributed to Harry Williams for the motorcycle collision.

## D.    Necessity and Reasonableness of Williams' Medical Expenses

223.    Under Oregon law, whether medical expenses are reasonable and whether the treatment is necessary are two distinct questions. Only "'*some* evidence' of necessity" is required to support a finding of medical necessity. *State v. Perdew*, 304 Ore. App. 524, 528, 467 P.3d 70 (2020). Medical examinations soon after an injury and doctor's notes regarding treatment are sufficient to establish medical necessity. *Id*. The reasonableness of those expenses also requires

"some evidence beyond just evidence of payment itself. That evidence, however, does not need to come from an expert or even from witness testimony; rather, it is enough that there is evidence that the requested restitution corresponds to relevant market rates." *State v. Bright*, 333 Ore. App. 58, 62, 551 P.3d 400 (2024). "The 'submission of a hospital bill, without more, is insufficient proof for recovery of 'reasonable' hospital or medical services'' and '[s]ome additional testimony or evidence is required to support the reasonableness of the bill[.]'" *State v. Tejeda-Serrano*, 328 Ore. App. 656, 659–60, 538 P.3d 1239 (2023) (quoting *State v. McClelland*, 278 Ore. App. 138, 144, 372 P.3d 614 (2016)).

224.   The parties agree that Harry incurred reasonable and necessary medical expenses of $492,031.01 through August 2017. *See* Trial Ex. 15. The Court awards Harry this amount.

225.   For the reasons discussed earlier in the Court's findings of fact, the Court also awards Harry $40,360.99 in additional past reasonable and necessary medical expenses through September 2022.

226.   For the reasons discussed earlier in the Court's findings of fact, the Court also awards Harry $24,658.00 for future reasonable and necessary medical expenses.

**E.   Other Economic Damages – Wage Loss**

227.   "'Economic damages' means objectively verifiable monetary losses including but not limited to reasonable charges necessarily incurred for medical, hospital, nursing and rehabilitative services and other health care services, burial and memorial expenses, loss of income and past and future impairment of earning capacity, reasonable and necessary expenses incurred for substitute domestic services, recurring loss to an estate, damage to reputation that is economically verifiable, reasonable and necessarily incurred costs due to loss of use of property and reasonable costs incurred for repair or for replacement of damaged property, whichever is less." O.R.S. § 31.705.

228.   The parties agree to past wage loss in the amount of $48,693.50.

229.   For the reasons explained earlier in the Court's findings of fact, the Court also awards Harry $532,955.00 in future wage loss.

**F.      Noneconomic Damages**

230.     "'Noneconomic damages' means subjective, nonmonetary losses, including but not limited to pain, mental suffering, emotional distress, humiliation, injury to reputation, loss of care, comfort, companionship and society, loss of consortium, inconvenience and interference with normal and usual activities apart from gainful employment." O.R.S. § 31.705.

231.     As discussed in the Court's earlier findings of fact, the 2016 accident caused Harry significant pain, mental suffering, emotional distress, humiliation, inconvenience and interference with his usual and normal activities. It caused Paula significant loss of care, comfort, companionship, and consortium.

232.     In addition to considering the evidence at trial, the Court has reviewed other orders from comparable FTCA cases arising from severe motor vehicle collisions. *See, e.g.*, *Kennedy v. United States*, No. CV08-02988 GAF, 2009 WL 3348404 (C.D. Cal. 2009) (awarding $2.1 million in general damages for lower extremity injuries to twenty-year-old requiring multiple surgeries with internal and external fixation); *Schoenfeld v. United States*, No. 02-cv-819 WQH (S.D. Cal. 2009) (awarding $2 million in general damages for amputation of leg below knee); *Oberson v. United States*, 311 F. Supp. 2d 917 (D. Mont. 2004) (awarding $1.78 million in general damages, plus $9.3 million in lost earnings and medical expenses, and $600,000 to child for loss of parent's relationship, for severe TBI and near-full paralysis after snowmobile accident).

233.     Considering the evidence and awards in comparable cases, the Court awards Harry $950,000 in general damages and Paula $300,000 in loss of consortium damages.

## IV.     CONCLUSION

234.     Based on the above findings and conclusions, the Court AWARDS Plaintiffs the following:

  a.   Past medical expenses (agreed): $492,031.01.

  b.   Past medical expenses (disputed): $40,360.99

  c.   Future medical expenses: $24,658.00

  d.   Past wage loss (agreed): $48,693.50.

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 33

e.   Future wage loss: $532,955.00.

f.   Noneconomic loss for Harry: $950,000.00.

g.   Loss of consortium for Paula: $300,000.00.

235.    Plaintiff Paula Williams is therefore awarded damages in the total sum of $300,000.00.

236.    Plaintiff Harry Williams is therefore awarded damages in the total sum of $2,088,698.50.

Dated this 11th day of October, 2024.

Tiffany M. Cartwright
United States District Judge